GATEWAYS TO BETTER LIVING, INC., APPELLEE, *v.* CREASY, DIRECTOR OF PUBLIC WELFARE ET AL., APPELLEES; ACKERMAN, DIRECTOR OF HEALTH, APPELLANT.

*Messrs. Lucas, Prendergast, Albright, Gibson, Newman & Gee* and *Mr. Rankin M. Gibson,* for plaintiff-appellee.

*Mr. Anthony J. Celebrezze, Jr.,* attorney general, *Ms. Deborah A. Piperni* and *Mr. Patrick A. Devine,* for defendants-appellees.

*Mr. Anthony J. Celebrezze, Jr.,* attorney general, and *Ms. Janet B. Stewart,* for appellant.

MOYER, J. This matter is before us on the appeal of defendant, John H. Ackerman, M.D., Director of Health of Ohio (director), from a judgment of the Court of Common Pleas of Franklin County mandatorily enjoining him to certify for Medicaid reimbursement seven intermediate care facilities operated by plaintiff, Gateways to Better Living, Inc. (plaintiff).

Most of the controlling facts are undisputed. Plaintiff, during the time in question, was a not-for-profit corporation operating group homes that were licensed and certified as intermediate care facilities for mentally retarded persons by the Ohio Department of Mental

Retardation and Developmental Disabilities (ODMR). The homes are operated pursuant to a contract with ODMR that requires ODMR to pay to the operators a per diem rate that is reduced by any reimbursement received from another governmental agency. Therefore, if the homes are certified by the Director of Health to the Department of Public Welfare under Title XIX of the Social Security Act, the per diem rate that the state pays to the intermediate care facility is reduced by the amount of reimbursement the facility receives under the Medicaid program. There was testimony that the amount of money at issue for the state is substantial. Plaintiff's homes are among approximately six hundred seventy-three intermediate care facilities that were established in the early 1970's in response to a policy decision to move some mentally retarded patients out of state institutions and into small facilities in local communities. The occupants of the homes are mentally retarded persons who could be supervised and habilitated in noninstitutional facilities.

To receive Medicaid reimbursement, plaintiff's homes are required to be certified to the Ohio Department of Public Welfare by the Ohio Department of Health which acts as the surveying agency.

Plaintiff's facilities are numbered one through eight and, except for facility number six, all homes house residents who "are not in need of professional services." Except for the residents of number six, all of the residents are ambulatory and most attend adult sheltered workshops. The residents of unit number eight are ambulatory but emotionally disturbed and require medication to effectively function in a group home setting. At the time of the hearing in the trial court, unit number six housed nonambulatory, multi-handicapped, blind, deaf and autistic persons. Nurses are on duty twenty-four

hours a day and plaintiff's administrator testified at the hearing in the trial court that they administer all medications to the residents of unit six.

In all of the facilities except unit six, a physician prescribes medication for the residents which is received at the facilities in prepackaged, individual unit dosages. For instance, if a patient is to receive three doses of a medication per day, the medication is received in three separate packages and kept in a locked box until they are administered by an employee, usually the houseparent, who is required to record the administration of the drug and his or her own initials on a card (medcard) that is part of a recordkeeping system. The physician determines both the medication and the supply of medication that each home will receive for each patient.

Plaintiff conducted a training program for the persons administering the medication to teach them emergency medical procedures; to introduce them to pharmacology; and to instruct them on administering medication under the unit dosage system, using the medcards and unit dose signout sheets, and ordering medications. The course was taught by plaintiff's director of health services, who is a registered nurse and a "qualified mental and retardational professional." She gave individualized instruction in each home and observed the houseparents administering medications to residents. The training program was approved by ODMR. The houseparents are instructed to call the nurse on duty in unit number six if they observe anything unusual about a resident who has taken a medication, and provisions are made for transferring a resident to a local hospital upon the instructions of the nurse. The "backup staff" for each of the group homes consists of a director of health services, a licensed practical nurse, a licensed psychologist, a physician who sees every resident on a regular schedule, a social caseworker,

an activities worker, maintenance and cleaning persons, a nutritionist, and five group home managers. That staff is available to the houses as needed.

The chief of the Office of Standards and Certification in ODMR, which is responsible for licensing plaintiff's facilities,[1] testified that it was ODMR's position that plaintiff's homes should not be required to use licensed people (nurses and licensed practical nurses) to administer unit dosage medications; that he was aware that there were facilities that have licensed practical nurses who have no training in administering drugs; that the ODMR's rules do not require licensed personnel to administer drugs in order to be licensed by ODMR to receive residents; and that the department believes that unlicensed personnel can safely administer unit dosage drugs.

In 1978, the director proposed to decertify plaintiff because plaintiff was permitting unlicensed personnel who had not completed a training program approved by the director in medication administration to give the unit dosage medications to its residents. A referee for the director found that Section 442.484, Title 42, C.F.R., did not require a licensed person to dispense unit dosage medications, and the decertification of plaintiff's homes did not proceed at that time.

Late in 1980, the director notified plaintiff in writing that plaintiff was in danger of losing its certification as an intermediate care facility for purposes of receiving Medicaid reimbursement because of plaintiff's alleged failure to comply with several federal requirements for participation in the Title XIX Medicaid program. Following a hearing before one of the director's hearing examiners, the director concluded that plaintiff was permitting "unlicensed personnel" to administer medications to the residents of its facilities and that plaintiff thereby violated federal regulations. The director found plaintiff's facilities one through five in noncompliance with federal regulations and plaintiff's facilities six and eight as not certifiable to the Department of Welfare for participation in the Medicaid program. It is that order that was found to be arbitrary, capricious and unreasonable by the trial court in its judgment mandatorily enjoining the director to certify plaintiff's facilities for Medicaid reimbursement.

The director asserts the following seven assignments of error in support of his appeal:

"1. The Court of Common Pleas erred in concluding that the order of the Director of Health, to transmit to the Ohio Department of Public Welfare certification of non-compliance for appellee's facilities nos. 1 through 5 and to deny certification for appellee's facilities nos. 6 and 8, is arbitrary, capricious and unreasonable. The court erred in not concluding that the Director's order was a reasonable exercise of discretion.

"2. The Court of Common Pleas erred in concluding that the appellant acted contrary to federal and state law, and also erred in concluding that the 'Interpretive Guidelines' and other federal directives and interpretations, on which appellant relied in part, are not applicable.

"3. The Court of Common Pleas erred in failing to give great weight to the appellant's interpretation of the Medicaid certifications standards and in failing to conclude that appellee's pro-

---

[1] The ODMR is authorized by statute to license the residential facilities operated by plaintiff and the Ohio Department of Health is designated by the Department of Health and Human Services as the agency that will recommend to the Public Welfare Department whether such a residential facility shall be certified or decertified to receive Medicaid reimbursements for the services provided.

cedures for administration of medications do not conform to the requirements of those standards as interpreted by the agency which applies them.

"4. The Court of Common Pleas erred in mandatorily enjoining the appellant to certify the Gateways facilities and in substituting its judgment for that of the agency when the appellee has not shown that the appellant's refusal to certify was clearly arbitrary, capricious, and unreasonable, that the appellant grossly abused his discretion, or that the appellant acted fraudulently, collusively, or in bad faith.

"5. The Court of Common Pleas erred in issuing an overly-broad injunction, even assuming *arguendo* that granting injunctive relief was proper.

"6. The Court of Common Pleas erred in issuing a *nunc pro tunc* judgment entry which changed the date of required certification of Gateways' units nos. 6 and 8 from the future effective date to a retroactive effective date.

"7. The Court of Common Pleas erred in not admitting appellant Ackerman's Exhibits 4 and 5."

In disposing of this appeal, we must determine whether the trial court abused its discretion when it found the director's order to be unreasonable and arbitrary and ordered the director to certify facilities numbered six and eight and to continue the certification of the other facilities. See *Akers* v. *Montgomery Cty. Welfare Dept.* (Dec. 29, 1983), Franklin App. No. 83AP-561, unreported.

The issue is whether the trial court erred by concluding that plaintiff is permitted to use unlicensed houseparents to administer medication to its residents rather than using registered nurses or licensed practical nurses to administer medication.

The first four assignments of error are interrelated and are considered together.

Both parties agree that the pertinent federal regulation is found at Section 442.484(a), Title 42, C.F.R.,[2] which provides as follows:

"A medication must be used only by the resident for whom it is issued. Only appropriately trained staff may administer drugs."

It is not disputed that the term "appropriately trained staff" is subject to more than one interpretation. Nor is it disputed that there is no state statute or federal regulation that defines who is an appropriately trained person or that expressly defines the responsibilities of a person who hands a medication to a resident of an intermediate care facility who will use the medication.

The director relies upon various written Interpretative Guidelines and Survey Procedures issued by the United States Department of Health, Education and Welfare and a Policy Memorandum from the Assistant Surgeon General to conclude that plaintiff was in violation of Section 442.484(a), Title 42, C.F.R., by permitting houseparents rather than registered nurses or licensed practical nurses to administer the unit dosage medications to its residents. After tracing the history of the Interpretative Guidelines relating to this issue, the director concludes that the following Survey Procedure issued as a part of Interim Interpretative Guidelines for the Application of the Regulation of Institutes for Mentally Retarded or Persons with Related Conditions by the Department of Health and Human Services justifies his action in denying certification to plaintiff:

"249.12(a)(8)(vi)

"The proper administration of medications is essential to safeguard residents. To ascertain that there is an

---

[2] Section 442.484(a), Title 42, C.F.R., was published on September 29, 1978, and was a recodification of Section 249.13(c)(7)(vii), Title 45, C.F.R.

effective method for the administration of drugs, the surveyor [defendant director]:

"* * *

"5. Verifies that if the persons authorized by facility policy to administer drugs are not licensed, there is evidence that such unlicensed personnel have completed a State approved course on administration of drugs and is performing in a safe manner."

He also relies upon a policy memorandum attached to Long Term Care Bulletin No. 76-54 sent from the Office of Long Term Care of the Department of Health, Education and Welfare which was received by the director's office in September 1976. The memorandum purports to assist state agencies in applying the regulation relating to the administration of medications by unlicensed personnel that was in effect in 1976. The memorandum includes the statement that the state boards of nursing are responsible for approving training programs that are developed in conjunction with the state survey agency (director) and the state pharmacy boards and other appropriate resources in the state health department and then defines the nature of the training that unlicensed personnel should receive.

The director's argument is simply that, since plaintiff does not employ nurses, licensed practical nurses or persons who have completed a training program approved by the Ohio Board of Nursing Education and Nurse Registration (nursing board), plaintiff's facilities cannot be certified for Medicaid payments because plaintiff violated the survey procedure which defines "appropriately trained staff."

There appears to be no dispute that the survey procedures which are a part of the Interim Interpretative Guidelines are drafted by "staff in Washington" and have no binding legal effect upon the director. The 1976 policy memorandum referred to *supra* attempted to in-

terpret the term "state approved training program" that is used in the survey procedure. There is considerable dispute between the parties regarding the effect of the applicability of the Long Term Care Bulletin of which the policy memorandum was a part because it was issued before Section 249.12(a)(8) (vi), Title 45, C.F.R., was recodified and became Section 249.13(c)(7)(vi), Title 45, C.F.R. The director argues that, because he relied upon various federal interpretations and statements about the administration of medications by unlicensed personnel, he therefore did not act arbitrarily and unreasonably. That argument may be persuasive in a different context but in this case other facts and the fact that the regulation is the only legally binding written direction causes us to conclude that the trial court did not abuse its discretion when it found the director acted unreasonably and abused his discretion when he issued a letter recommending against certification of plaintiff's facilities.

Even assuming the director's argument should be controlling, taken to its conclusion it places plaintiff in a "Catch-22" position. For, while the director argues that plaintiff must use personnel who are licensed by the nursing board, that board, the pharmacy board and the Department of Health all deny having any authority to approve a training program for the dispensing of drugs by persons who are not pharmacists, nurses or licensed practical nurses. The record includes exhibits which support the conclusion that neither the state pharmacy board nor the nursing board, both of which are part of the director's agency, has the express authority to train or approve a specific course to be used in the administration of medication by persons who are not directly regulated by those boards.

However, another state agency, ODMR, does claim to have such authori-

ty and, in fact, has developed and approved a training program for nonlicensed personnel to distribute the unit dosage drugs that are at issue in this case. ODMR, in part out of the frustration of the director's failure to develop or initiate the development of a program for training unlicensed personnel and believing that it had authority under R.C. 5123.19 to develop such a program, developed its own program for unlicensed personnel in group homes such as those operated by plaintiff and in state institutions.

R.C. 5123.19 grants to ODMR the authority to license residential facilities to receive and care for people with developmental disabilities. Ohio Adm. Code 5123:2-3-21 expressly gives the administrator of the residential facilities the authority to make provisions for the care and dispensing of medicine pursuant to the orders of a physician and the instruction of a pharmacist. Plaintiff's facilities were licensed by ODMR after it determined that the plaintiff had a satisfactory training program for the persons administering unit dosage drugs to its residents. There is considerable evidence and some exhibits in the record demonstrating ODMR's efforts at resolving the issue of who should be permitted to administer unit dosage medication in the group homes. The testimony supports a conclusion that for many of the group homes such as those operated by plaintiff it simply is not economical for each medication to be handed to the resident by a nurse or licensed practical nurse. It was the testimony of the representative of ODMR, Mr. Fry, that ODMR believed the nonlicensed personnel should be permitted to dispense unit dosage medications and that they could do so safely.

When the director of ODMR submitted a request to the director to approve two programs for training unlicensed personnel in the administration of medications, he received a response on June 17, 1981 from the director stating that such programs must be approved by the state board of nursing and developed in conjunction with ODMR and the state board of pharmacy and that the director had no indication that ODMR training programs were developed in that manner. The director found no specific deficiencies in the ODMR training programs.

The nursing board advised ODMR that it had no authority to approve a specific course administered by any other agency than an Ohio approved school of nursing. The pharmacy board provided a similar response.

ODMR then requested an opinion from the Ohio Attorney General and also apparently met with the Governor to resolve the interdepartmental stalemate. The record does not include a response from the Attorney General to the request of ODMR for a legal opinion.

Support for the view of ODMR and of plaintiff is found in the most current statement by the Department of Health and Human Services regarding this question which was recorded in 45 Fed. Reg. 47371 on July 14, 1980. The statement was made by the Health Care Financing Administration in relation to a proposed rule and is as follows:

"(9) With regard to the use of medication aides rather than licensed personnel in the distribution of medications, we have found that there is no national consensus. While many States require that only licensed personnel perform this function, a significant number permit specially trained medication aides under the direction of a licensed nurse to distribute medications. Consequently, we will defer to State law in this matter. We feel that the central issue is not who actually administers the medication, but who is on-site and trained to recognize and attend to drug reactions. Since this proposed rule explicitly holds the director of nursing services accountable for drug administrations, we expect

that the distribution will be under the supervision of a licensed nurse. Furthermore, with the advent of unit does [sic] dispensing it seems less efficient to use licensed personnel for the dispensing function."

While those comments were not binding upon the director, they are at least as persuasive as the outdated Long Term Care Bulletin and Policy Memorandum issued in 1976 and serve to dispel the director's contention that he was bound by directives of federal agencies to require only licensed personnel to administer drugs. Section 442.484, Title 42, C.F.R., does not require persons administering drugs in intermediate care facilities to have completed a state approved training course. However, the record before us is that the director has proposed to decertify plaintiff's facilities one through five and refuse to certify facilities six and eight for Medicaid reimbursements primarily because of his reliance upon a policy memorandum issued in 1976 by the Assistant Surgeon General; the director of ODMR who licenses plaintiff's facilities disagrees because he believes that appropriately trained staff are not required to complete a training program approved by the nursing board or the Department of Health and because he was totally stymied in his efforts to resolve the dispute over conflicting views by different federal bureaucrats.

While it is not for us to determine the intentions of the parties in this matter, the effect of the actions and inactions of the director is to place nurses and licensed practical nurses in a special position which is neither required nor warranted by the federal regulation. The judgment of the trial court finding the director's order to be arbitrary, capricious and unreasonable is not an abuse of discretion and is in accordance with law. The first four assignments of error are not well-taken and are overruled.

In support of his seventh assignment of error, the director argues that the trial court erred when it did not admit into evidence his (defendant's) exhibits 4 and 5. The exhibits are a letter and a policy statement explaining the position of the nursing board regarding administration of medications in health care facilities. Because of our disposition of the first four assignments of error, any error committed by the trial court in not admitting the two exhibits is nonprejudicial to the director, and the assignment of error is therefore overruled.

In support of his sixth assignment of error, the director argues that the trial court erred in sustaining plaintiff's motion for a *nunc pro tunc* entry which requested the trial court to change the date the director was required to certify plaintiff's facilities six and eight. The effective date for such certification in the judgment entry was November 12, 1982 and the *nunc pro tunc* entry changed that effective date to November 12, 1980. Plaintiff argued that the *nunc pro tunc* entry merely corrected a typographical error in the original judgment and that facilities number six and eight should be certified effective on the date plaintiff received notification from the director that the facilities would not be certified.

The record before us does not include the *nunc pro tunc* entry or a copy thereof. We are not inclined to hold that the trial court abused its discretion when we do not have before us the entry of which the director complains. Furthermore, it appears that the trial court could have found that facility number six should have been certified effective in November 1980 because of the testimony of plaintiff's administrator that nurses in unit six were administering medications to the patients. A nurse for the Department of Health testified at the hearing before the director's hearing examiner that nurses were not administering medications to the residents

of unit number six. However, the director was not required to give her testimony more weight than the testimony of plaintiff's administrator which was in direct conflict to that of the nurse. The sixth assignment of error is not well-taken and is overruled.

The director's fifth assignment of error is sustained. As the director argues, the judgment entry of the trial court which enjoins the Department of Health to certify plaintiff's facilities is overly broad because it appears to require that plaintiff's facilities be granted an open-ended certification that would survive violations of Medicaid requirements that occurred subsequent to the certification. The trial court's judgment also can be read to give grandfather status to the training program for the administration of medication approved by ODMR even if the federal regulation were changed in a way that would cause plaintiff's current practice to be clearly in violation of federal law. The trial court is instructed to modify the judgment entry to confine it to the facts in the record and the law as effective at the time of the trial court's judgment.

For the foregoing reasons, the first, second, third, fourth, sixth and seventh assignments of error are overruled and the fifth assignment of error is sustained, and the judgment of the trial court is affirmed in part and reversed in part with instructions to modify.

*Judgment affirmed in part and reversed in part with instructions to modify.*

WHITESIDE and COOK, JJ., concur.

COOK, J., of the Eleventh Appellate District, sitting by assignment in the Tenth Appellate District.

WHITESIDE, J., concurring. Although I concur in the opinion and judgment, I do so with the understanding that no issue has been raised or determined herein whether the practices involved are prohibited by any provisions of R.C. Chapters 3719, 4723, 4729, 4730, or 4731, or any similar provision of law not specifically discussed in our opinion.